# IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF MISSOURI WESTERN DIVISION

| | | |
|---|---|---|
| **William G. Duff, individually and as Trustee of the William G. Duff Trust** | ) ) ) ) | |
| **Plaintiff,** | ) ) | |
| v. | ) ) | **Civil Action Number 07-00751-CV-W-JTM** |
| **Otto Hohner GBR, Hohner Maschinenbau GMBH, Hans Peter Schoellhorn, and Claus-Otto Hohner,** | ) ) ) ) | |
| **Defendants.** | ) | |

## MEMORANDUM AND OPINION

### I. Preamble

In 1988, William G. Duff ("Duff"), Hans Peter Schoellhorn ("Schoellhorn"), and Claus-Otto Hohner ("Hohner) formed a Missouri corporation, Hohner Stitching Products ("Hohner USA"). Duff was the Chief Executive Officer and owned 49% of the company, while 51% was owned by Otto Hohner GbR (a German company owned by Schoellhorn and Hohner). After several years, the relationship between Duff, on one hand, and Schoellhorn and Hohner, on the other, began to deteriorate. Ultimately, in early 2007, Schoellhorn and Hohner, as directors of Hohner USA, terminated Duff's employment with the company (although his 49% ownership in the company remained).

In November of 2007, a shareholders' meeting for Hohner USA was held wherein amended articles on incorporation were adopted that did not authorize shareholder preemptive rights. Under Missouri law, a corporation is not obligated to offer existing shareholders an opportunity to participate in the purchase of any new stock issuances if the shareholder has no preemptive rights. MO. REV. STAT. § 351.305. Subsequently, Otto Hohner GbR increased its investment in Hohner USA thereby increasing its stock ownership to 67% (and decreasing Duff's ownership to 33%). Thereafter, Hohner USA was merged into a newly formed company.[1] Consequently, the "old" Hohner USA no longer existed and Duff was not a shareholder in the new company.[2]

Prior to the merger, on August 21, 2007, Duff[3] filed an action in the Circuit Court of Jackson County, Missouri, against Otto Hohner GbR, Schoellhorn and Hohner, as well as another German company, Hohner Maschinenbau GMBH. The defendants removed the case to this Court. Following the merger, Duff filed a SECOND AMENDED VERIFIED PETITION before this Court, asserting eight causes of action , to wit:

---

[1] Under Missouri law, a corporation can vote to merge into another company, if the merger is approved by a two-thirds vote of the shareholders. MO. REV. STAT. § 351.425.

[2] In response to the merger, Duff filed an action in the Circuit Court of Jackson County, Missouri, against the new company. *Duff v. Hohner Stitching Merger, Inc.*, Case No. 0816-CV18521 (Mo. Cir. Ct.). This state court action was filed under the Missouri appraisal statute, MO. REV. STAT. § 351.455. Under that law, a minority shareholder who dissents from a merger may file a lawsuit to ascertain the fair value of the minority shares that were owned prior to the merger. MO. REV. STAT. § 351.455.5.

[3] Duff filed the action individually and as Trustee of the William G. Duff Trust. The Court will merely refer to "Duff."

(a) breach of fiduciary duty and conspiracy against Otto Hohner GbR, Hohner Maschinenbau GMBH, Schoellhorn, and Hohner for improperly engaging in competition with Hohner USA, appropriating corporate opportunities available to Hohner USA, failing to disclose corporate opportunities available to Hohner USA, overcharging on parts sold to Hohner USA, and wrongfully terminating Duff from Hohner USA [Counts I, II, and III];

(b) breach of contract against Hohner Maschinenbau GMBH for producing items with a particular stitching head [Count IV];

(c) an alternative derivative[4] action on behalf of Hohner USA against all of the defendants for the allegations contained in Counts I through IV [Count V];

(d) breach of Duff's compensation agreement against all of the defendants for overcharging on parts sold to Hohner USA [Count VI];

(e) breach of Duff's agreement regarding intellectual property against all of the defendants for accrued royalty payments due to Duff [Count VII]; and

(f) a declaratory judgment against all of the defendants seeking a declaration that the merger is invalid and void [Count VIII].

After considerable briefing on various legal matters by the parties resulting in several orders being issued by the Court, only a single legal claim raised by Duff remained unresolved – Duff's breach of contract in Count IV of the SECOND AMENDED VERIFIED PETITION against Hohner Maschinenbau GMBH for producing items with a particular stitching head – the intellectual property of which Duff claims is personally owned by him.

---

[4] In general terms, a stockholder's derivative action is an action brought by one or more stockholders of a corporation to enforce a corporate right or to prevent or remedy a wrong to the corporation. Although a corporation is generally a distinct entity from its stockholders, if a stockholder believes that the corporation has been harmed, he or she may be entitled to bring a derivative suit, in the corporation's name, to seek redress for that injury.

By the agreement and consent of the parties, the remaining claim was tried before the Court on February 22-23, 2010. The Court heard testimony from several witnesses and, as reflected on the Exhibit Index on file, numerous exhibits were received into evidence. The Court observed the demeanor and judged the weight and credibility of all witnesses and evidence at the trial. In making credibility determinations, the Court considered the relationship of the witnesses' interest in the outcome of these proceedings, the witnesses' demeanor while testifying, the witnesses' opportunity to observe and acquire knowledge of what they were testifying about, and the extent to which the testimony was supported or contradicted by other credible evidence. *Perkins v. General Motors Corp.*, 709 F.Supp. 1487, 1499 (W.D. Mo. 1989).

The Court has fully considered <u>all</u> of the testimony, evidence, and arguments of the parties whether or not explicitly discussed herein. In the context of a trial without a jury, courts have consistently noted that FED. R. CIV. P. 52(a) does not require "either punctilious detail [ ]or slavish tracing of the claims issue by issue and witness by witness." *Fair Housing in Huntington Committee, Inc. v. Town of Huntington, New York*, 316 F.3d 357, 364 (2nd Cir. 2003). Instead:

> A trial court's findings satisfy Rule 52(a) if they afford the reviewing court a clear understanding of the factual basis for the trial court's decision. . . . If a trial judge fails to make a specific finding on a particular fact, the reviewing court may assume that the court impliedly made a finding consistent with the general holding so long as the implied finding is supported by the evidence. Where the trial court makes no direct reference to a claim but must necessarily have found a certain fact, the appellate court will imply such a finding.

*Reich v. Lancaster*, 55 F.3d 1034, 1057 (5th Cir. 1995) (*citations omitted*).

The following constitutes the Court's findings of fact and conclusions of law pursuant to FED. R. CIV. P. 52(a):

## B. Findings of Fact

1. Hohner Maschinenbau GmbH is a German company, started in 1930 and now owned by Schoellhorn and Hohner, that is in the business of manufacturing, marketing, and selling stitching machines and stitching heads.

2. Hohner Maschinenbau GmbH has subsidiary companies in the United States, England, Spain, and China.

3. In 1988, Duff, Schoellhorn, and Hohner formed a Missouri corporation, Hohner Stitching Products ("Hohner USA"), as the United States subsidiary for Hohner Maschinenbau GmbH.

4. Duff was the Chief Executive Officer and owned 49% of the company, while 51% was owned by Otto Hohner GbR (a German company owned by Schoellhorn and Hohner).

5. Sometime prior to April 2002, Duff derived a new stitching system product from an existing product being sold by Hohner USA (the HSS-18 system).

6. This "old" HSS-18 system had been developed between Hohner USA and Hohner Maschinenbau GmbH.

7. The "old" HSS-18 system was marketed and sold by Hohner USA.

8. Duff never claimed personal ownership of the "old" HSS-18 system.

9. The "new" product became known as the HSS-HK system and consisted of three main elements: an electronic controller, a drive unit, and a stitching head.

10. In 2001, Duff discussed the HSS-HK system with Schoellhorn and Hohner.

11. Both Schoellhorn and Hohner concluded that Hohner Maschinenbau GmbH was not interested in participating in the development of the HSS-HK system because the company

5

did not then have the production capacity and neither Schoellhorn nor Hohner believed that the HSS-HK would be successful in Europe (where Hohner Maschinenbau GmbH made many of its sales).

12. With the knowledge of Schoellhorn and Hohner, Duff proceeded to develop the HSS-HK system, but apparently neither sought nor obtained any patent for the "new" product.

13. Duff and Schoellhorn discussed the HSS-HK system and agreed that machine shops that had worked with Hohner USA would be utilized to the extent that parts for the proposed HSS-HK system prototype were not already available from Hohner Maschinenbau GmbH (such as right-hand centering devices and cutting knives or springs).

14. By the beginning of 2002, the HSS-HK system had been developed to the point where it could be marketed.

15. The assembly of the HSS-HK system took place at Hohner USA by employees of Hohner USA.

16. In early 2002, Duff showed Schoellhorn a prototype of the HSS-HK system at a trade show in Chicago and the two men discussed manufacturing, marketing, and pricing options.

17. Prior to April 2002, Duff did not tell either Hohner nor Schoellhorn that he considered himself (as opposed to Hohner USA) to be the owner of the HSS-HK system.

18. Prior to April 2002, Hohner Maschinenbau GmbH decided to show the HSS-HK system at the IPEX trade show, a biannual event in Birmingham, England.

19. On April 2, 2002, Duff faxed a letter ("the Letter Agreement") to Hohner in Germany.

20. The Letter Agreement was drafted in whole by Duff.

21. The fax cover page for the Letter Agreement was sent with the address and logo of Hohner USA and included the following note:

> Dear Claus:
>
> As we discussed, please find the following page to be an agreement that I would like signed prior to my shipment of this new system to [the] IPEX [trade show].
>
> If you have any questions, feel free to call me. I will not ship this system without this agreement signed.
>
> Kind regards,
> */s/ Bill*
> William G. Duff

22. The Letter Agreement contained in fax transmission stated:

> Agreement between parties William G. Duff/Hohner Stitching Products, Inc. and Hohner Maschinenbau GmbH, Tuttlingen, Germany/Claus Otto Hohner authorized agent of Hohner Maschinenbau this date, 2 April, 2002.
>
> As discussed via phone conversation, it is agreed this date that the following described products developed by William G. Duff will not be copied or reproduced, directly or indirectly by Hohner Maschinenbau GmbH. Claus Otto Hohner further agrees to obtain agreements with Heidelberg, the manufacturer of saddle switchers in Germany, that the following described "Drive Unit" will not be allowed in their hands without prior written agreement that they would not copy or reproduce this product in whole or in part, in actual design or it's [*sic*] concept/theory of operation. It is further agreed that this product will be sold exclusively from our jointly owned Corporation, Hohner Stitching Products, Inc.
>
> [The Letter Agreement then contains a description of the HSS-HK system]
>
> Violation of this agreement will result in financial remedies equal to that lost revenue both immediate and future, as well as losses

7

due to manufacturing commitments and equipment investment, directly and indirectly.

23. The Letter Agreement contained a line for the signature of Hohner as the "Authorized agent for Hohner Maschinenbau GmbH."

24. On April 4, 2002, Hohner signed the Letter Agreement.

25. During this entire time period, Duff was the Chief Executive Officer and President (and minority shareholder) of Hohner USA.

26. Duff had a signed employment agreement with Hohner USA which provided that Duff would "devote substantially all of his energies, abilities, and productive time to the performance of his duties" with Hohner USA.

27. When the Letter Agreement stated that "Violation of this agreement will result in financial remedies equal to that lost revenue both immediate and future, as well as losses due to manufacturing commitments and equipment investment, directly and indirectly," Duff was referring to lost revenue for Hohner USA.

28. In October of 2006, after Duff complained that Hohner Maschinenbau GmbH had copied aspects of the HSS-HK system, Hohner sent an e-mail to Duff wherein he asked: "How can a mother company copy something from the daughter?"

29. Duff replied to Hohner, stating, "I must clarify that the HK drive box is not the intellectual property of Hohner [USA], it is the intellectual property of William G. Duff."

30. This e-mail was the first notice to Hohner, Schoellhorn, and/or Hohner Maschinenbau GmbH that Duff considered himself the personal owner of the HSS-HK system.

## C. Conclusions of Law

To make a submissible case on his breach of contract claim, Duff must prove: (1) a mutual agreement between parties capable of contracting; (2) mutual obligations arising out of the agreement; (3) valid consideration; (4) part performance by one party; and (5) damages resulting from the breach of contract. *Intertel, Inc. v. Sedgwick Claims Management Services, Inc.*, 204 S.W.3d 183, 2020-03 (Mo. App. [E.D.] 2006). As a preliminary matter, then, Duff must establish that an enforceable contract exists between himself (personally)[5] and Hohner Maschinenbau GmbH. Thus, the April, 2002 Letter Agreement must possess all the essential elements of a contract under Missouri law.[6] *Randall v. Harmon*, 761 S.W.2d 278, 279 (Mo. App. [S.D.] 1988).

In broad terms, the essential elements of a contract include " (1) competency of the parties to contract; (2) subject matter; (3) legal consideration; (4) mutuality of agreement; and (5) mutuality of obligation." *Ketcherside v. McLane*, 118 S.W.3d 631, 635 (Mo. App. [S.D. 2003). Thus, with regard to the fourth element, it is axiomatic that a "meeting of the minds" of all parties on all of the "essential terms" is a prerequisite to the formation of a contract. *Id.*; *Karsch v. Carr*, 807 S.W.2d 96, 99 (Mo. App. [E.D.] 1990); *Tom Davis Ins. Agency, Inc. v.*

---

[5] In Count IV of the SECOND AMENDED VERIFIED PETITION, Duff plead that Hohner Maschinenbau GmbH beached the Letter Agreement it made with Duff <u>and</u> Hohner Stitching Company. SECOND AMENDED VERIFIED PETITION ¶ 106, at 30. Hohner USA was not named as a party in this litigation. Moreover, as found by the Court in a previous order, Duff is unable to assert any derivative claims on behalf of Hohner USA. Consequently, Duff's breach of contract claim is legally viable only if Duff personally was a party to the Letter Agreement.

[6] The parties are apparently in agreement that the law of Missouri controls the outcome in this case.

*Shivley*, 799 S.W.2d 195, 197 (Mo. App. [S.D.] 1990). This requirement is not new to Missouri law:

> To use a homely expression – it takes two to make a contract. There must be a meeting of the minds of the parties to a contract as to its terms and conditions. . . . This meeting of the minds is not based on some secret purpose or intention on the part of one of the parties, stored away in his mind and not brought to the attention of the other party, but must be based on a purpose and intention which has been made known or which, from all the circumstances, should be known.

*McClintock v. Skelly Oil Co.*, 232 Mo. App. 1204, 114 S.W.2d 181, 189 (1938). Although not an issue that routinely arises in contract actions, there can be dispute that "the identity of the parties to be bound" is an "essential term" of a contract. *Scotts Co. v. Central Garden & Pet Co.*, 403 F.3d 781, 788 (6th Cir. 2005). *See also Alligood v. Procter & Gamble Co.*, 72 Ohio App.3d 309, 311, 594 N.E.2d 668, 669 (Ohio App. [1 Dist.] 1991); *Zell v. Cobb*, 566 So.2d 806, 808 (Fla. App. [3 Dist.] 1990); *Merschrod v. Cornell University*, 139 A.D.2d 802, 805, 527 N.Y.S.2d 109, 111 (N.Y. App. Div. [3rd Dept.] 1988).

In Missouri, courts look to the parties' <u>objective</u> manifestations of intent to determine whether there was a "meeting of the minds." *McDaniel v. Park Place Care Center, Inc.*, 918 S.W.2d 820, 827 (Mo. App. [W.D.] 1996). This objective theory of contracts stresses an outward manifestation of assent made by one party to the other party. *Computer Network, Ltd. v. Purcell Tire & Rubber Co.*, 747 S.W.2d 669, 675 (Mo. App. [E.D.]1988). The parties' objective intent and what a reasonably prudent person would have believed from the actions or words of the parties is analyzed. *Dickemann v. Millwood Golf & Racquet Club, Inc.*, 67 S.W.3d 724, 728 (Mo. App. [S.D.] 2002) ("[C]ourts look to the parties' objective manifestations of intent to determine whether there was a meeting of the minds that would form a valid contract.").

What a person may have intended subjectively is not controlling. *Computer Network, Ltd.*, 747 S.W.2d at 675; *see also Fiegener v. Freeman-Oak Hill Health Sys.*, 996 S.W.2d 767, 771 (Mo. App. [S.D.] 1999) (*citing McDaniel v. Park Place Care Ctr., Inc.*, 918 S.W.2d 820, 827 (Mo. App. [W.D.] 1996)) ("A party's subjective intent is irrelevant."). Instead, "[i]t is the actions and not the intentions or suppositions of the parties which determines whether or not there is a contract." *B-Mall Co. v. Williamson*, 977 S.W.2d 74, 78 (Mo. App. [W.D.]1998) (*citing L.B. v. State Committee of Psychologists*, 912 S.W.2d 611, 617 (Mo. App. [W.D.] 1995)).

In this case, the Court concludes that the credible evidence establishes that Duff <u>subjectively</u> intended and believed the Letter Agreement to be a personal contract between himself and Hohner Maschinenbau GmbH. Moreover, the Court concludes that the credible evidence establishes that Otto Hohner signed the Letter Agreement <u>subjectively</u> intending and believing that it was an agreement between Hohner USA and Hohner Maschinenbau GmbH. As noted above, however, these subjective intentions and beliefs – no matter how firmly held – do not answer the question as to whether there was meeting of the minds with the Letter Agreement.

As previously explained, "the first essential of a valid contract is the existence of two or more competent parties who agree." *Shofler v. Jordan*, 284 S.W.2d 612, 614 (Mo. App. 1955).

> [A]lthough the parties need not be named formally there can be no enforceable agreement unless the contracting parties may be identified with reasonable certainty.

*Id*. (*citations omitted*). To this end, a court must first examine the language employed in the contract itself. *See*, *e.g.*, *Headrick Outdoor, Inc., v. Middendorf,* 907 S.W.2d 297, 300 (Mo. App. [W.D.] 1995); *see also* RESTATEMENT (SECOND) OF CONTRACTS § 214 (1981).

11

Only if the language in a contract is ambiguous should a court consider extrinsic evidence. *Headrick Outdoor, Inc.*, 907 S.W.2d at 300. In general, "[a]n ambiguity exists when there is more than one reasonable interpretation that can be gleaned from the contract language." *Coughenour v. Bates*, 785 S.W.2d 291, 297 (Mo. App. [S.D.] 1990). With regard to the Letter Agreement, as discussed by the Court in its prior order, such ambiguity does exist. On one hand, the Letter Agreement begins with a recitation that it is an agreement "between parties William G. Duff/Hohner Stitching Products, Inc. and Hohner Maschinenbau GmbH, Tuttlingen, Germany/Claus Otto Hohner authorized agent of Hohner Maschinenbau." On the other hand, Duff argues that the information provided after each name (*i.e.*, following the forward slash "/") was simply "contact details." This argument is – perhaps – bolstered to some degree by the fact that Duff's individual name is listed first without any particular reference to a company position while Hohner's name is listed and specified as the authorized agent of Hohner Maschinenbau GmbH. Further confusing the issue is the sentence in the Letter Agreement that provides that the HSS-HK System "will be sold exclusively from <u>our</u> jointly owned corporation Hohner [USA]." The sentence reads as though the Letter Agreement is being made by and between the owners of Hohner USA and not between Hohner USA and another party. The problem is that Hohner USA was owned by Duff and Otto Hohner GbR – a company not named by Duff in his breach of contract claim set out in Count IV of the SECOND AMENDED VERIFIED PETITION. Consequently, the Court must consider the extrinsic evidence provided by the parties. To that end, the Missouri Supreme Court has found:

> The cardinal principle for contract interpretation is to ascertain the intention of the parties and to give effect to that intent. In order to determine the intent of the parties, it is often necessary to consider not only the contract between the parties, but subsidiary agreements, the relationship of the parties, the subject matter of the contract, the facts and circumstances surrounding the execution of the contract, the practical construction the parties themselves have placed on the contract by their acts and deeds, and other external circumstances that cast light on the intent of the parties.

*Butler v. Mitchell-Hugeback, Inc.*, 895 S.W.2d 15, 21 (Mo. 1995) (*en banc*) (*citations and internal punctuation omitted*).

In addition to the language in the Letter Agreement itself, the Court has considered other credible evidence proffered at the trial, including:

- The HSS-KK system was derived from a prior product – the HSS-18 system – that had been developed between Hohner USA and Hohner Maschinenbau GmbH and was marketed and sold by Hohner USA. Despite his participation in the development of the HSS-18 system, Duff never claimed personal ownership of the HS-18 system.

- Duff neither sought nor obtained any patent for the HSS-HK product.

- The HSS-HK system was made using machine shops that had worked with Hohner USA previously – to the extent that parts for the proposed HSS-HK system prototype were not already available from Hohner Maschinenbau GmbH (such as right-hand centering devices and cutting knives or springs).

- The assembly of the HSS-HK system took place at Hohner USA by employees of Hohner USA.

- Prior to April, 2002 (and indeed prior to October, 2006), Duff did not tell either Hohner nor Schoellhorn that he considered himself (as opposed to Hohner USA) to be the owner of the HSS-HK system.

13

- The fax cover page for the Letter Agreement was sent with the address and logo of Hohner USA.

- During this entire time period, Duff was the Chief Executive Officer and President (and minority shareholder) of Hohner USA working under a signed employment agreement with Hohner USA which provided that Duff would "devote substantially all of his energies, abilities, and productive time to the performance of his duties" with Hohner USA.

Viewing this evidence, the Court concludes that there was no meeting of the minds between the various entities as to the identity of the parties to be bound by the Letter Agreement. Put alternatively, the Court concludes that an reasonably prudent person would not be able to ascertain the parties to be bound by the Letter Agreement either from the language in the Letter Agreement or from the actions and words of the parties. The Court finds that a mutual mistake occurred when the Letter Agreement was executed. The law of mutual mistake is well-settled:

> Where a mistake of both parties at the time a contract was made as to a basic assumption on which the contract was made has a material effect on the agreed exchange of performances, the contract is voidable by the adversely affected party unless he bears the risk of mistake.

RESTATEMENT (SECOND) OF CONTRACTS § 152(1) (1981).

Applying this legal standard to the Letter Agreement, the Court finds that the parties to be bound by the Letter Agreement was a "basic assumption" made at the time the Letter Agreement was signed. Moreover, the mistake materially effects the agreed upon exchange of performances. In this case, the mistake is the difference between Hohner Maschinenbau GmbH granting exclusivity rights to one of its subsidiaries (over which it would still retain some profits) or granting exclusivity rights to an individual employee (who could – and tried – to market the stitching systems to Hohner competitors).

Finally, the Court does not find that Hohner Maschinenbau GmbH[7] bears the risk of mistake. In this regard, it is critical that the Letter Agreement was drafted entirely by Duff and at no point prior to the creation and execution of the Letter Agreement did Duff specifically inform Hohner, Schoellhorn, Otto Hohner GbR, or Hohner Maschinenbau GmbH that he was claiming personal ownership of the HPP-HK system. Under these circumstances, the Court finds that it is appropriate for Duff to bear the risk of mistake about the Letter Agreement.

For the foregoing reasons, it is

**ORDERED** that the Court finds in favor of defendant Hohner Maschinenbau GmbH and against plaintiff Duff on Duff's breach of contract in Count IV of the SECOND AMENDED VERIFIED PETITION.

                                               */s/ John T. Maughmer*
                                                **JOHN T. MAUGHMER**
                                              **U. S. MAGISTRATE JUDGE**

---

[7] As the party defending a claim of breach of the Letter Agreement, Hohner Maschinenbau GmbH is "the adversely affected party" that is seeking to have enforcement of the Letter Agreement (as interpreted by Duff) voided.